# STATEMENT OF FACTS

1. My name is Coanne Wilshire. I reside at 304 West 117 Street, (Larkspur) a property owned in partnership by L&M Development Partners and Lemle & Wolff Companies, using Corporate Title, LARKSPUR MANAGERS LLC. (Lemle & Wolff 's property management division, manages the property.)

2. L&M is arguably the City's BIGGEST provider of Affordable Housing and have propelled Lemle Wolff Companies into mega-growth. This Larkspur was used to launch, Lemle & Wolff Companies. L&M is ranked #2 on New York City's Landlord list of biggest Evictors.

3. I am disabled and my disability interferes with my ability to engage in the daily activities of walking and standing.

4. From June 1, 2005 until July 31, 2018, I rented a handicap parking space in the parking lot at rear of the building, **It's a Required Accessory, Off Street, Open, Parking Lot.**

**5.** I bring this lawsuit because my landlord and its property management division violated the ADA, the FHA and the Rehabilitation Act by deliberately interfering with ability to use my handicap parking spot in an effort to cause me to give up the spot, and, when that effort failed, by terminating my lease of the spot based on a pretext. The Landlord and its property management division was fully aware that the Parking Lot is illegal (non-compliant) and collected rent on an illegal Lot using an illegal Parking agreement for an Off-Street, Required Accessory Parking Lot.

   **Background**

6. The building launched on April 1, 2005. I moved into this building because I was assured that I could rent a Handicap Parking Space. I received medical advisement to get a handicap parking spot to help stay off my feet.

7. I have a permanent mobility impairment which was first documented by a W.C. Law Judge in 1995.

8. This impairment is caused by my disability of rare bony deformities, exacerbated by acute Ichthyosis, extreme hyperkeratic lesions and chronic plantar callouses on the soles of both feet. Three of five metatarsal bones hit the ground before others resulting in a pressure that feels as if the bones will push through my flesh.

9. My disability impairs my ability to carry out the daily life activities of walking and standing.

10. My feet always hurt. It is imperative that I avoid prolonged standing and walking otherwise I am prone to stumbling or falling.

11. On June 1, 2005 I was assigned handicap parking space #25.

12. I presented handicap parking permit paperwork and rented my Handicap Parking Space without official ownership of a car. The landlord's staff was very familiar with me, my car access and my disability status.

13. It was known that I did not own a car at the time we entered into the lease for the handicap spot. This is substantiated by the fact that there are NO Car Details in my Parking Agreement, Clause 1A.

14. Management regularly parked in my Space when I was not using it, at no time was Clause 1A referenced.

15. I have family friends who own a transportation company and I have unlimited access to vehicles.

16. On a regular basis Cars were dropped off to me or I would be picked up and taken to the Owner's office to choose or return the vehicles. The cars entrusted to me are luxury high-end vehicles, in my exclusive possession.

17. I used my parking space with more frequency than several, non-disabled parking tenants.

### **Interference with My Use of My Disabled Parking Spot**

18. The Parking Lot is required to have two Accessible parking spaces. When I rented June 1, 2005, it was #25 and #26 with a shared Access Aisle in between them.

19. The Landlord is obligated to construct and maintain accessible features. HUD ANSI AI17.1/FHA rules state all access aisles should remain free of obstructions at all times.

20. By late 2015/ early 2016, the building was generating more garbage than had been allotted for. The Approved site-plans in Records at Department of Buildings, show a Refuse Storage Room should be more than 3 feet larger than the one that exists.

21. By the end of 2016 the garbage overspill was being placed in the Access Aisle which encroached into my parking spot.

22. In 2017 there was a new Property Manager, Pablo Rios assigned to the building.

23. In 2017 the landlord got a Fannie Mae Loan, over the property's value at $37M. An aggressive agenda for Individual Apartment Improvement units began. The new property manager sanctioned that the gutted apartment refuse be dumped in the Access Aisle.

24. The mandated Access Aisle was converted into a dump site for renovation refuse from Individual Apartment Improvements. Discarded appliances, cabinets etc. created a personal danger to me and potential vehicle damage. The refuse attracted rats.

2

25. I made several complaints, but would not give up my parking space. A physical border was placed in the Access Aisle to keep the barrage of dust, debris and construction refuse squarely on me in Handicap Parking Space #25 but away from the non-disabled tenant in Handicap Parking Space #26.

26. The Access Aisle overflowed, surrounded and encroached into my Handicap Parking Space with dust, debris, filthy old splintering wood flooring and moldy cabinets. My allergies were constantly triggered and in the midst of these conditions I developed bronchial asthma.

27. The tenant of Handicap Parking Space #26 is non-disabled and the mounds of refuse did not intrude into her space, only into mine. A commercial Vendor regularly used this spot.

28. I had always used the Access Aisle as a shortcut into the building because the Accessible parking spaces are not connected to the Access Route as required by law. ADA/FHA. ANSI 4.3 Note 3. I was concerned about maneuvering past the piles of refuse and discarded appliances and potential damage to my vehicle by random construction workers moving in and out of the Access Aisle and my parking space and the sharp corners they dumped.

29. I complained frequently about the terrible conditions infiltrating my spot. The Property Manager continued to ignore my complaints.

30. Increasingly, from late 2016 through July 2018 access to my parking space was limited due to the conditions the Landlord created at my parking space. FHA makes it unlawful for the Landlord to not make modifications necessary to afford me full enjoyment of rental. New York State FHAA Section 3604(f) (3)(B) and Human Rights Executive Law provides that it is unlawful discriminatory practice for a Landlord to not make reasonable accommodations necessary for me to use and enjoy my space. Instead the gross conditions increased.

31. In an attempt to silence my complaints, the "office" sent word through the Building Super that my parking space was not a Handicap Accessible Parking Space. In the same conversation the Building Super told me that the Landlord only acknowledged #26 as a Handicap space.

32. I asked to be transferred to Parking Space #26. The Super said I would not be assigned Parking Space #26 because I "was not in a wheelchair".

33. To add to the Landlord's wheelchair requirement to rent Handicap Parking Space #26, the Landlord contacted the tenant in 6M who is confined to a wheelchair, to ask if she wanted to rent Parking Space #26. This is the only tenant that was solicited for a parking space. The non-disabled tenant renting #26 at the time reports being shocked and upset to be told the tenant in 6M had dibs on her spot.

34. Ranking my disability is inherent disability discrimination. To contact the tenant in a Wheelchair immediately after removing disability designation on my space shows the Landlord's attempt to cover bases around my disability discrimination complaints. The

3

tenant in 6M has a visible disability, mine is hidden. The Landlord cannot pick and choose which disability to respect. Two Handicap spaces are mandated for the parking lot.

35. Even if it was legal for Parking Space #26 to be the sole accessible parking space, an Access Aisle would be required and governed by Accessibility Standards for Accessible Design, specifications.

36. The Construction Application and the Approved site-plans show two Handicap parking spaces. The removal of Accessibility from my parking space was a targeted act of oppression against me.

37. The Landlord's agents, commercial vendors and another commercial tenant were allowed to park in my spot without my permission. When I requested offenders towed or penalized, I was denied. I had the inconvenience of waiting to park in my own rented spot, many times. I have photo proof of this actual violation of Clause 1A on the Parking Agreement, but rules have only been enforced against me.

38. There were only a handful of times in 2018 that I was able to park in my spot. These were during times when I was able to communicate with the Landlord's Leasing Director, Melissa Rosario, whom I met in 2005. It had become difficult to reach her but when I did, she would facilitate my space and the Access Aisle being cleared. As my proof shows the cleanup was always short-lived.

39. On December 13, 2017, my 92-year-old father fell at home and broke his hip. After emergency surgery, he was transferred to convalesce in a Rehabilitation facility at Rockville Centre, Long Island. My mother who was in her late 80's needed almost as much support as my father did. I needed to get back and forth to the Bronx and Long island with flexibility. I was able to juggle arrangements a few times with a contact at 279 West 117th Street and 15 West 116th Street and paid to be able to park in the lots that service their buildings. Luckily, my son was available to drop me at my door and take the car to the alternate parking lots, but this was exhausting and not a sustainable parking arrangement by any means. I was forced into the extra cost of using car services.

40. I was humiliated by all the dust and debris that was only in my spot. It made me feel lesser than the non-disabled tenants but I needed my parking space and kept trying to reach the Property Manager at times begging for a solution to the squalid conditions.

41. In January 2018, the commercial tenant, who was often parked in Space #14, contacted me after noticing I was not parking in my space. He did not have access to Parking space #14 on the days the commercial tenant (Armando Pennella) who officially rented the Space, was in the office, which varied one to three times a week.

42. He was willing to cover most of my rental cost and park in the garbage in order to see his patients and avoid tickets from street parking. He agreed that he would move his car if my space was cleared or whenever I needed to use my parking space.

4

43. I continued leaving messages to the Property Manager about the blockage of debris in the Access Aisle and filthy conditions at and in my parking space, I continued to plead for the conditions to be returned to normal. He continued to ignore me.

44. The Landlord should have created another place for the excess but chose to get rid of me instead ; the ONLY parking tenant with a disability. The Landlord broke NYC Administrative laws and federal laws with gross negligence of rules and required maintenance.

45. The Landlord terminated me for doing exactly what non-disabled tenants also did/do. It is a common occurrence for commercial vehicles and cars belonging to non-tenants to park in parking spaces on the Lot. After I received the Termination letter, I found out that the Parking Lot is for Residents Parking only and the Landlord is non-compliant on All uses in the Parking lot. The commercial tenant that was used to terminate me continues to park in the Residents only-parking lot, in Parking Space #14 which is rented by another Commercial tenant, to this day. Yet, I am the only tenant that has been terminated.

**My Parking Spot Lease Is Illegally Terminated**

46. The Property manager ignored all my complaints for over a year. I advised the Property Manager that I was unable to park in my spot due to the conditions he intentionally created.

47. By June 2018, the Building Super stopped delivering my messages to the Property Manager. I got the sense he was getting in trouble for relaying my arguments. The Leasing Director stopped taking my calls or responding to my emails for help.

48. I continued to ask for correction at my parking space without receiving a response. On July 15, 2018, the Access Aisle was exorbitantly dusty and especially repulsive. I sent emails accusing the landlord of singling me out with discriminatory and hazardous conditions at my Handicap spot. I received no response.

49. On July 26, 2018 it was even worse yet, the Access Aisle was loaded with pallets, cabinets, flooring, splinters and overwhelming dust. My space was almost surrounded. The mass was bulked up at the front of my space and crossed the border of the Access Aisle, into my Handicap Space. I wrote my strongest worded email yet, about the conditions, the fact that I was being singled out and being treated unfairly. I copied the Property Manager's Supervisor and the Leasing Director. I also left a firm message.

50. The very next day on July 27, 2018, the Property Manager came to the Parking Lot, but he never contacted me. Instead he took the opportunistic photo of the Commercial Tenant's car in my spot, to use on the Breach and Termination Letter.

51. To demonstrate the Property Manager's discriminatory intent and Ambush action, the Access Aisle and my space was cleaned up before taking his termination photo. (As seen on my photo 7/26 and his, 7/27.)

5

52. On July 31st, 2018 I received my first response ever from the Property Manager in a year plus, of my repetitive complaints. He had answered my email with the Breach and Termination letter. He did not address my complaints or my previous years' worth of ignored emails and calls or the fact that other parking tenants were doing the exact same thing and more, without penalty or termination.

53. The reason given for termination is Paragraph 1A of the License Agreement. DHR/HUD did not compare the lies written in the Landlord's Position Statement to the actual Termination Letter and the actual Parking agreement. The intentional lie in the Termination letter states that Paragraph 1A includes wording: "one vehicle owned by you", but it does not. Also, there were no "observations" made as the letter states. The wording is a deliberate cover-up for the Property Manager's illegal termination.

54. On July 27, 2018 when the Property Manager was in the Lot and took the photo of the Commercial Tenant in my parking spot, there were commercial cars and non-tenant cars in the spaces of non-disabled tenants. The same existed on July 31, 2018, but I alone received a termination letter.

55. At the time of termination, I had been a reliable tenant of 13 years with zero Landlord issues. There can be no doubt that an agenda against me existed.

56. I saw the Property manager on August 6th, 2018, this was only the third time we had ever seen each other, since his employment. He was in the building to see a new tenant. He said, "I should have never had the space." He appeared to catch himself and then said, "any car I drove would have to be registered to the building."

57. The property manager came up with that new rule for me, despite the fact that non-disabled parking tenants had cars with out-of-state plates parked in the lot at that very moment. It's noteworthy, that the first time I met the Property Manager it was because he had double parked, blocking my access into my spot. For more than 15 minutes I waited for the building Super and building Security to locate him so I could park. It is clear Rules are only for me.

58. I am the first and only Person with Disabilities in the history of the Parking lot that rented an Accessible space with an Accessibility Parking Permit. The landlord used discriminatory action to illegally take my handicap parking space away so they can continue to illegally use the Access Aisle for garbage and fortuitously give the amenity to a higher-rent- paying, non-disabled tenant.

59. The landlord has exhibited multiple incidences of disparate treatment against me. Their rules for one tenant but are not for another tenant.

60. The Legal Director attempted to run the clock on my complaints with a Delay strategy. After I complained that my termination was an illegal ambush, the Property Manager was quickly transferred from the building. The Legal Director, Glenys Pena told me she would investigate my complaints and get in touch with me to set up a meeting so we can "discuss what had transpired and next steps."

61. For three months the Legal Director, cited vacations, holidays and scheduling, as excuses to keep stringing me along, always ending with her commitment to a meeting to "discuss my issues."

62. I questioned her seriousness. She was dragging her feet so on October 25, 2018 I sent her an email, with attached images of a moped and surfboards in Parking Spots #1 and #8, to show her I had proof of disparate treatment. My email to the Legal Director was sent on October 25, 2018, but in the Landlord's Position Statement they state my "complaint" about tenants with Surfboard and Moped in their spots is the reason why the Property Manager came to the Parking Lot on July 27, 2018. I had never mentioned the Surfboards and Moped before October 25, 2018. Still, the Landlord used Surfboards and Moped as their [false] alibi for why the Property Manager was at the Lot on July 27, 2018.

63. The Legal Director responded to my October 25, 2018 email on October 27, 2018, she repeated I would hear back from her to set up a meeting. However, four days later on October 31, 2018 I was alerted by building staff that my parking space had been reassigned to a new non-disabled tenant effective November 1st, 2018.

64. It's obvious there was never a real plan to meet with me or address my legitimate complaints. The Legal Director had been using a delay tactic, calculating I would be past the deadline to make an official disability discrimination complaint.

65. The tenant that took over Handicap Parking Space #25, has no encroachment of debris into her space, ever. In July 2020, a second non-disabled tenant began parking in Handicap Space #25, there is no encroachment of debris for her either.

66. In December 2019, the Landlord became cognizant that I had been diligently taking photos and documenting the policy and practices in the Parking Lot. On January 12, 2020 the Landlord threatened me with apartment eviction, claiming I owe them money but providing no proof of debt. This is another tactic of harassment and an attempt to distract from their wrongdoing and to intimidate me into silence. It caused several unnecessary hours on my feet to show proof that I do not owe them. I sent proof of rent payments by Certified Mail, Regular mail and email to the Landlord but they never responded. They sent me a second notice of Intention to evict. I got the City involved, the Department of Tenant Resources requested a copy of the rent log from the Landlord but the Landlord did not respond to them either.

67. The Property Manager has deliberately sullied my reputation and relationship with building staff and neighbors, gossiping that I was being a troublemaker by taking photos and "causing the building staff more work." This caused one porter whom I had been friendly with for over a decade to stop speaking to me altogether.

68. The Property Manager gossiped about me, my income status and my case with disparagement and ridicule on multiple occasions, to Security and building staff. The Super in turn made unprovoked complaints about me to the porters, security persons and tenants. These actions were deliberately done to further humiliate and intimidate me.

**The Landlord Lies About Why It Terminated My Parking Lease**

69. The Landlord lied to DHR/HUD, that the Access Aisle was a Half Space to be used when there is Construction in the building.  An Access Aisle is easily recognized. Representatives at ADA Northeast and NYC Department of Buildings have viewed the same images I submitted to DHR/HUD and agreed without hesitation that they show 2 Accessible Spaces with a shared Access Aisle.

70. After they terminated me, the Landlord used white paint to distort the accessibility designation on Parking Space #25 and the Access Aisle and create doubt on my complaints.  The use of white paint by the Landlord has distorted the required features determined by 2010 ADA Standard Design of Accessibility.

71. Using paint to disguise Accessibility status of Accessibility and negate valid complaints and wrongful termination from me as a Person with Disabilities is disability discrimination.  There are no rules of ADA at this Lot, which is discriminatory.

72. The Landlord submitted material false statements to DHR and HUD to cover up their discriminatory behavior and lies against me, simultaneously they submitted material False Statements to NYC Department of Buildings to coverup the facts that they were breaking NYC codes and regulations in their acts of discrimination against me.

73. The Landlord illegally converted the Access Aisle in violation of ADA/FHA requirements. The very act of conversion is an act of discrimination.

74. DHR/HUD: Agencies tasked with investigating disability and race discrimination, should have discernment to recognize blatant lies and identify features of Accessibility.

75. There was ongoing construction for several months after the building launched.  At no time throughout my parking tenancy was there ever construction refuse in the Handicap Access Aisle, until 2017 and IAI's. (although other debris had been dumped there).

76. The landlord's Leasing Director intervened on my behalf to have my space cleared multiple times and the term Half Space was never mentioned.  Furthermore, the Approved Site Plans for the development, proves there is no Half Space, only two Disability Parking Spaces and an Access Aisle!

77. The parking dimensions of Parking Space #25 plus 24 other spaces do not conform to ZR 25-62: which requires a minimum length of 18 feet for all parking stalls.  The other two spaces do not meet requirements of maneuverability.  An illegal Parking Agreement should not have been enforced against me.  The Landlord should not be allowed collect rent on an illegal parking lot.

**Harassment by the Landlord**  *Photo Documentation for All*

78. The Landlord repeatedly broke the same License Agreement rule, they enforced on me as the excuse for termination. On multiple occasions the Landlord has literally taken over

8

my parking space. This was their initial tactics of harassment in hope I would get frustrated enough to give up my handicap parking space. Neither the Landlord's Parking Agreement nor the Certificate of Occupancy, says the Landlord is exempt from the rules.

79. The Landlord continues to rent a Parking Space (#14) to a Commercial tenant, knowing the Lot is Residents Only. Inspectors have investigated this matter for issuance of a Violation but somehow the Commercial tenant is not parked when the inspector arrives.

80. On July 15, 2020, when an Inspector arrived to inspect Parking Space #14, the space was "coincidentally" empty again. The Property Manager was present at the building and spoke with the Inspector at length, yet continues rental and parking of Commercial Tenants. Later that same day, on July 15, 2020, after the Inspector left, the Commercial Tenant that was used to terminate me, parked as per usual.

81. It is plausible that the Commercial tenant worked with the Landlord to terminate me. The Commercial tenant is the only one of six commercial tenants that has unlimited access to the residential building and building amenities against the Rules, including unlimited access to launder commercial medical laundry in the residential Laundry Room and the business has a Residential mailbox in the Residential lobby.

**History of Making False Statements** *Photo Documentation for All*

82. As a participant of 80/20 Affordable housing, the Landlord was granted a waiver for a reduction of parking spaces, down to 31 spots. There are 27 parking spaces on the Lot. The Landlord submitted fraudulent certifications and are guilty of Material False Statements and the False Claims Act.

83. In October 2018, the Landlord drew four 2ft X 2ft fake parking spaces in the Lot. Took overhead photos, magnified them, added a sworn, notarized statement that their breach was cured and submitted to DOB Office of Administrative Trials and Hearings as a Certificate of Correction. It is obvious the documents are faked but *[like DHR/HUD]*, DOB Office of Administrative Trials and Hearing accepted the Landlord's false evidence. It took 9 months before I was able to get someone at DOB to look more closely and rescind the original Acceptance of Correction. OATH/ECB #35344504K.

84. After they terminated me, the Landlord allowed the same Commercial tenant who was in my spot to park at no charge, in the fake parking spots on the days when the Commercial tenant of record for Parking Spot #14, was using his space.

85. On February 20, 2020 the Landlord received a $5000.00 fine for filing Material False Statements on faking four parking spaces, OATH/ECB #35426519M. On February 21, 2020 the Landlord received additional enforcement action for having only 27 parking spaces. OATH/ECB #35426520J, 16 months after I initially reported the 27 spaces as part of my complaint.

86. The Landlord has a history of flouting rules. Two mandated outdoor Recreation Spaces are required on the property as part of the Quality Housing program agreement. There

are no outdoor recreation spaces on the property. The landlord converted Outdoor Recreation Space on the 8th Floor into massive cell towers space it rents to Verizon.

87. A prerequisite of the reduction of parking spaces is the Landlord's certification that the Parking Lot would be Attended. The Lot has never been attended. The Landlord created a fake Attendant sign with the Building Super's phone number on it and moved to have the violation dismissed using a pretext that does not apply to Required Accessory Parking Lots. DOB upheld the violation but obviously missed that the Landlord's argument did not fit the parking lot status, the penalty fee was cut in half. The parking lot is not attended, the Attendant cannot double as the Super, the Sign is a lie. On a May 7, 2020, the violation was Sustained. OATH/ECB #035426504J

**88.** On June 24, 2020 the Landlord's go-to, Policy of Delay was thwarted. The Landlord had succeeded in delaying OATH hearing until 2021 but received four more Violations with elevated penalties, for not presenting Certificates of corrections that is required but typically overlooked until hearing dates. OATH/ECB #39024437M, #39024438Y, 39024439X and #39024441P. Hearings for the new violations have also been rescheduled. The landlord has multiple opportunities to reschedule and cure, but went to immediate termination with me. Courtesy option to cure is for them not for me.

### The Landlord Has an Animus Toward Persons with Disabilities

89. In 2011 former Attorney General Preet Bharara sued the Landlord and Architect, of Larkspur LLC for violating the design and construction provisions of the federal Fair Housing Act. The suit resulted with Civil Penalties and Aggrieved Persons Fund. Architectural Services firm, Larsen, Shein, Ginsberg & Snyder were also named. The Landlord has an animus for People with Disabilities. The Landlord succeeded in keeping the Parking lot and the "Ghost" units at 318 West 117th Street hidden.

### The Agencies Incorrectly Conclude that My Termination Was Proper

90. My official complaint with DHR is dated 11/8/2018 and with HUD on 11/8/2018, DHR investigated for both agencies.

91. The DHR issued a determination letter on March 14, 2019 adopting all of the false statements of the landlord: including that garbage surrounded my parking spot because my parking space was next to a Half Parking Spot used for storage during construction and that I was responsible for the Commercial tenant parking in the Lot.

92. I have refuted those conclusions above.

93. The DHR came up with additional grounds for the termination as well, by accepting the Landlord's lies. The Letters of Determination list that I did not own a car, that I did not provide registration in 30 days, that I never made a proper request for a handicap spot; and that I was offered my spot back in September 2018.

94. With regard to the statement that I did not own a car, while that is correct, that was not a ground on which the landlord relied to terminate my lease, so DHR never should have raised it. Also, the landlord lied in the Position Statement when they said, I was asked to provide ownership and registration information within 30 days in the Breach and Termination letter. This is false, so DHR and HUD never should have raised it.

95. Moreover, car ownership was never required by the agreement, and the landlord and property owner had known I did not own a car since I had been leasing my handicap parking spot for thirteen years when I was terminated. The parking Agreement does not stipulate car ownership as a requirement to rent. Car ownership should never have been raised by DHR/HUD.

96. I did make a proper request for a handicap spot back in 2005, as my application for Disability permit and subsequent Permit shows.

97. I was never offered my spot back, nor was I ever offered a different spot. DHR listed a complete and unfounded, untruth.

98. On March 14, 2019 building staff was informed that the Property Manager, Pablo Rios would be returning to the building. On March 16, 2019 I received DHR's letter of Determination, in favor of the Landlord it was dated March 14, 2019. My whole case with DHR/HUD should be immediately overturned.

99. HUD issued a determination on July 3, 2019 also reaching the incorrect conclusion that the termination was proper, on similar erroneous grounds to those relied on by DHR. HUD wrongly added that I subleased my parking spot to a commercial Tenant. If I was sub-leasing I would not have contributed one penny toward the monthly fee, and would have sought to profit with an up charge.

100. HUD wrongly believes that I am the reason the Commercial Tenant had access into the Lot, but that is not correct and proven by the fact the Commercial tenant used to terminate me, still parks in the lot. My termination using a Commercial tenant as a reason cannot be justified when more than two years later the Commercial tenant is still parking in the Lot. The actual infraction is not corrected, I should be immediately given my Accessible space back and made whole.

**Selective Enforcement of the Rules of the Parking Lot** *Photo Documentation for All*

101. On July 16, 2016 my son and I came home to find a non-disabled Commercial Tenant in my spot. It was not the first time his car was in my spot. I did not know who he was at the time. I had complained repeatedly and the car was supposed to be towed if it was ever in my spot again. I called the Building Super and requested the towing service. The Building Super came to the Lot and witnessed the car in my spot but directed me to park in Parking Space #24 until the car moved. The commercial tenant did not receive a termination letter for being in my spot, was given multiple opportunities to cure and still parks in the Residents Only, Required, Accessory Parking Lot.

102. The landlord allows non-disabled vendors and commercial vehicles to park in the lot regularly. The Landlord also allowed non-disabled Commercial vendors and vehicles to park in my spot without my permission.

103. The non-disabled tenant, that was assigned to my Handicap Parking Space, #25, on November 1, 2018, rented with a car that has Pennsylvania plates. In August 2018, the Property Manager had insisted that if I parked one car it must be registered to the building. This tenant also stored surfboards at her spot and has had different cars parked in her spot without receiving a termination letter. Against ADA/FHA rules the Landlord did not give this tenant, or the subsequent tenant a legally required Month to Month parking agreement. There is also no ADA/FHA signage as required by law, which carry Civil and Criminal penalties.

104. The non-disabled tenant at Parking Space #1 regularly park two cars in the space. The tenant also allows other tenants without Parking Agreement to use the parking space when they are not using it. The one car/one space "rule" that was adopted for my termination is not enforced on any other tenant.

105. The non-disabled tenant of Parking Space #3 does not own a car. This tenant uses out of state cars belonging to non-resident family members or rental cars. This tenant parks less than 6 months out of a year and is exempt from the one car/one space rule the Property Manager insisted was a rule for me. There are often Commercial persons and commercial vehicles parked in this space. She has received no termination letter. I used my parking spot much more than this tenant.

106. The non-disabled tenant of Parking Space #4 has a non-resident with out of state plates primarily parking in this spot. (License Plate, NJ B81 JXJ). There are at least 3 cars that use this spot. It is implausible that the non-disabled tenant-of-record is not charging the primary parker. The non-disabled tenant has received no Termination letter.

107. The non-disabled tenant of record for Parking Space #6 moved out of the building years ago. The space is openly used for guest parking by the non-disabled tenant of Parking Space #27. Sometimes the tenant of Parking Space #27 parks her car in this spot, she is one tenant that owns one car but has two spaces. This non-disabled tenant is not given a Termination Letter. Obviously, I used my parking spot more than Parking Spot #6 is used, about 2 months out of a year.

108. The non-disabled tenant at Parking Space #8, primarily allowed a non-resident to park in this spot from before my termination through December 22, 2019. (License Plate NY FWY 3171) This car was parked in the lot when the Property Manager came to the lot on July 27, 2018 and when he sent me a termination letter on July 31, 2018. This non-disabled, non-resident parked daily while the tenant parked their vehicle in the street. It is implausible that the non-resident did not pay the parking rental fee. Since December 22, 2019 and up until today, two cars have alternately parked in this spot.

109. The non-disabled tenant of Parking Space #23 primarily parks a company vehicle (NYP plates). This is a commercial car, openly parked by the tenant. When the tenant's NYP

vehicle is not parked, it is commonplace to find commercial vendors, commercial vehicles and out of state cars are parked in this spot. The non-disabled tenant has not been given a Termination letter.

110. The non-disabled tenant of Handicap Parking Space #26 also did not own a car. The tenant infrequently used this spot, it was used by the tenant as non-resident family visitors. Primarily it was used by a Commercial vendor. From November 2018 to September 2019 this non-disabled tenant stored a non-functioning vehicle with NJ plates in the spot. Once the stored car was moved, the commercial vendor resumed parking in Parking spot #26. This Property Manager regularly doubled park in front of this spot but a non-functioning car covered in dust did not cause him to make a comment much less issue a Termination letter to this tenant. This non-disabled tenant gave up the space in December 2019, she never received a mandated Month-to-Month License Agreement. On January 1, 2020 a new non-disabled tenant was assigned Handicap Parking Space #26, this tenant also does not have a mandated Month to Month parking agreement. There is also no ADA/FHA signage as required by law, which carry Civil and Criminal penalties.

111. The non-disabled tenant of Parking Space #27 commonly has multiple cars in her space, including commercial vehicles and cars with out of state plates. She has revolving storage at this parking space which the Landlord stated in my Position Statement is prohibited. here and huge oil stains in her spot which is against the Landlord's rules. She has received no Termination Letter.

112. The Landlord boldly altered the standard ADA design at Accessible Parking Spaces #25 and #26 with shared Access Aisle, using white paint.

113. The original site plan proves ADA regulations are intentionally missing from the Lot. The fraudulent certifications and signoffs in the original Construction records proves the Landlord is guilty of False Claims Act and Material False Statements. The Landlord's lies to DHR/HUD against me should be immediately overturned and my file cleared.

**Summary of Legal Violations**

114. The Landlord illegally changed original conditions at my Handicap Parking Space after more than a decade into my tenancy without warning or my agreement. The Landlord provided an indecent parking rental for me alone, the sole parking tenant in the history of the Lot with a disability and a disability parking permit.

115. The Landlord disrupted my Legal Right to quiet enjoyment, with a barrage of Fair Housing Parking Abuses that left me unable to have full use of my parking space.

116. The Landlord perpetrated aggressive methods of fraud, intimidation and humiliated me.

117. The Landlord targeted me with harassing tactics by taking over my parking space for their sole use and benefit, without my permission and charged me full rent while they did it. I was unable to park many times through direct action of the Landlord's agents but

there was never a pro-rated bill. Just as they did with NYC government funding, 421a tax credits and Quality Housing incentives, they took all the benefits and reneged on full return.

118. The ADA stipulates that all Access Aisles should remain free of obstructions at all times, maintained in good repair . Snow, ice and dried leaves are specifically mentioned. My photographic evidence shows my entire parking spot and the Access Aisle taken over by pruned sidewalk trees which the Landlord dumped there.

119. The Landlord's complete non-compliance on all ADA rules in the Parking Lot is an example of their disability discrimination.

120. In New York, RS 4.6.2.1 Multiple Dwellings as provided by §25-412 of the Zoning Resolution, where the Lot is exclusively on an accessory basis for Residents, a Month to Month lease must be given to non-disabled tenants renting an accessible parking spot. Signs of these requirements must be permanently and prominently posted. (Emphasis Added)   The Landlord is subject to Civil and Criminal penalties.  Neither non-disabled tenant, renting the Accessible spaces on the lot have the required Month to Month leases.

121. On 8/9/2017, New York City Council determined and documented that "untenable conditions are allowed to exist because of loopholes in the Department of Buildings Inspection and violation processes." New York City Council exposed the fact that non-compliance is  handily used to oppress tenant. My experience validates their findings.

122. ADA, FHA, HUD, New York City and Federal Fair Housing Act list all examples below as Harassment, all represented in my parking tenancy:
Deliberately causing construction related problems.
Failure to remove excessive dust and debris.
Denial of Lawfully entitled rental.
Creating uncomfortable conditions designed to force me to leave.
Not responding in a timely, reasonable and responsible manner.
Refusing to perform required maintenance.
Purposely creating unsafe conditions.
Creating humiliating and offensive environment.
Creating a nuisance with garbage and stored leaves.
Disrupting ability for quiet enjoyment.
Unjustified eviction notices.
Bullying intimidation and Violating warranty of peaceful Use.
Rental overcharging.
Providing false information.
Reporting false information against me and knowingly and willfully make materially false, fictitious and fraudulent statements.
Disparate treatment
Non-compliance of federal, state and city ordinances.

### **The Harm I Suffered**

123. Handicap Parking Spaces are closer to the door of the building and have a wider space allowance to enter and exit vehicles which is very important, every step counts, especially during times of comprised balance.

124. Having a disabled parking space near the entrance to my apartment building allowed me to sustain what had become normal/tolerable, pain level of 4 on a scale of 1-10.

125. The more time I spend on my feet, the more concentrated the pain and sensitivity. Moderate errands by foot on one day and I am left virtually immobile for a week. Any prolonged walking or standing for me, is a pain crisis that compromises my balance and posture. Prolonged standing is worse than prolonged walking, both result in piercing pain and cramping. Limiting my standing or walking and having my Handicap parking space is vital to mitigate my level of suffering.

126. The landlord recklessly and deliberately interfered with the normal function of my household and my quality of life. Not having my parking space has caused an accelerated deterioration of my impairment.

127. Within three months of my parking spot being taken away I had to be re-prescribed opiates which I had not been prescribed since 2006, to control my pain. I am also prescribed increased dosage medication for anxiety and depression from a therapist.

128. In 2019 painful new hyperkeratic lesions developed on the big toes on both feet and my toes are swollen. The plantar callouses on the soles of my feet have spread and the cores have deepened. The sides and outer heels of my feet have an intense, hardened buildup, that constrict circulation and sporadic numbness has increased. My ankles, knees and back are also affected as my stance is constantly adjusted to combat the worsening of my feet. Both feet now have limited flexibility to a degree I have not experienced before.

129. My mobility is diminished from 30% mobility loss in 2018 to 60% average mobility loss from more than 2 years of living without my needed handicap parking space.

130. The Covid19 pandemic has exacerbated how my life is hampered without my disabled parking spot. On April 1, 2020, I had no choice but to stand on a line for 45 minutes to get into the grocery store. I had been trying to get in many times, on this day the still-long-line was shorter than usual. I stood on the line in the store for an additional 15 minutes. For weeks after I spent many hours in bed on pain and anxiety meds to escape the hurt.

131. My father had his 95th birthday April 29, 2020 I could not drive by and wave to him on the porch. My Mother had her 92nd birthday March 17, 2020, I could not even drive by and wave at her on the porch. I'm lucky enough to have my parents, this unnecessary sacrifice is devastating.

132. If my Handicap Parking Space had not been taken away, I would have been able to drive to stores that offer curbside pickup and stayed safe in a clean car. Grocery delivery

services are very limited and getting a delivery slot is hit or miss. I have had to do without more times than has been comfortable, spent more money than I cared to for restaurant delivery or have had to begrudgingly rely on neighbors for emergency items here and there, which feels burdensome and defies my authentic independent nature.

133. The Landlord is proven to be a liar and a cheater. If he would lie and cheat to HPD, DOB and NYC government, it is implausible that I would be selected as the one instance to be Fair and honest.

**Damages Sought**

134. I want my Parking Spot back and my case at DHR corrected or purged.

135. I want all or at minimum a portion of 13 years of payment refunded because of the poor conditions I was forced to endure, its illegal sized space, my access was often blocked due to improper action by the property manager and ADA/FHA non-compliance. New York City Department of Buildings, show documented violations which prove the off-street, Required, Accessory parking lot has been illegal throughout my tenancy.

136. My quality of Life is forever affected due to the reckless, discriminatory actions of the Landlord.

137. I want compensation for my depleted respiratory health due to steady exposure of dusty construction-site conditions which triggered my allergies and contributed to developing bronchial asthma.

138. I want compensation for the pain and suffering I experience after being illegally deprived of my handicap parking spot, which caused me to spend unnecessary, damaging time on my feet. My mobility impairment has significantly deteriorated making my permanent disability worse.

139. I want the Landlord to be held accountable and face the maximum penalties available. I am asking for consequential, compensatory, general and punitive damages.